Yaman Salahi (SBN 288752)
yaman@salahilaw.com
Nicole Cabañez (SBN 365099)
nicolec@salahilaw.com
Taylor Applegate (SBN 357742)
taylora@salahilaw.com
**SALAHI PC**
505 Montgomery Street, 11th Floor
San Francisco, CA 94111
Tel: (415) 236-2305

Albert J. Plawinski*
**PLAWINSKI, PLLC**
2101 Pearl Street
Boulder, Colorado 80302
Tel: (303) 720-7095
Email: albert@plawinski.law

*Pro Hac Vice Admission to be sought*

*Counsel for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| RAMADAN ROUBY, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>J.G. WENTWORTH COMPANY, a Delaware corporation,<br><br>*Defendant.* | Case No.: 4:26-cv-3082-HSG<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>(1) Violation of 18 U.S.C. § 2511<br>(2) Violation of Cal. Pen. Code § 631-632<br>(3) Intrusion Upon Seclusion<br>(4) Breach of Confidence<br>(5) Negligence<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Ramadan Rouby brings this class action complaint individually and on behalf of all others similarly situated against Defendant The J.G. Wentworth Company ("J.G. Wentworth") for unlawfully disclosing consumers' sensitive loan application information with third parties without consent. Plaintiff brings this action based on personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

1

**NATURE OF THE ACTION**

1.      J.G. Wentworth is a financial services company with a unique set of product offerings, targeted towards individuals and families that are struggling financially.  The company began as a structured settlement company, offering cash up-front for future payment streams that typically provide for incremental payments, like settlements from lawsuits and annuities.  These products are intended for and marketed towards consumers that need cash quickly.  Defendant has since expanded its product offerings to provide other products that fit this brand, including home equity loans and debt consolidation and resolution.

2.      These latter products, debt consolidation and debt resolution, are for consumers with high amounts of unsecured debt, typically in high-interest credit cards.  Debt consolidation refers to a single loan that can be used to pay off various credit card balances.  Debt resolution, on the other hand, is not a loan.  It is a debt settlement strategy that requires consumers to stop paying their debts and to pay J.G. Wentworth instead.  J.G. Wentworth then accumulates the money from these payments and uses the consumer's default on their credit obligations as leverage to attempt to negotiate an agreement with the consumer's creditors, usually for a reduction in the amount owed.  Because it requires consumers to stop making payments on their debts, debt resolution often carries many adverse consequences, including plummeting credit scores and collections lawsuits.  J.G. Wentworth often uses advertisements for debt consolidation and personal loans as an entry point for potential debt resolution customers with poor credit, pitching the product after a consumer has been denied a loan.

3.      Merely being a J.G. Wentworth customer, or an individual inquiring about becoming a J.G. Wentworth customer, reveals that the consumer is likely struggling financially.  Applications and inquiries for J.G. Wentworth products also require that consumers divulge sensitive details about their financial life, including how much debt they owe, what they need the money for, and other highly personal information, like their contact information.

4.      Yet, unbeknownst to consumers submitting these highly sensitive applications, J.G. Wentworth embedded web trackers on its website that transmit the contents of the loan applications to third parties entirely without the consumer's knowledge or consent.  These trackers perform various functions, often with the ultimate purpose of analyzing consumer information, and then monetizing

2

those analyses by further disclosing the information to advertisers. In installing these trackers, J.G. Wentworth disclosed sensitive information contained in the loan applications including, but not limited to, Plaintiff's and the Class Members' names, email addresses, phone numbers, loan amount, income, homeownership status, credit worthiness, and—in the case of a home equity line of credit—the home's value and equity.

5. Neither Plaintiff nor any other Class Member signed a written authorization permitting Defendant to send any of the sensitive financial information to third parties.

6. Unsurprisingly, J.G. Wentworth puts profits before the dignity of its customers and failed to inform Plaintiff and the Class of its egregious practice of disclosing consumers' sensitive financial information—let alone obtain the sufficient consent as mandated under the Gramm-Leach-Bliley Act and related state statutes.

7. Confidentiality is paramount in the financial industry. Despite legal and ethical duties to protect consumers' financial information, Defendant undermined the importance of safeguarding consumers' financial information, breaching consumers' trust.

8. Plaintiff seeks to remedy these harms and brings causes of action for (1) violation of the Electronic Communication Privacy Act ("ECPA"), 18 U.S.C. § 2511(1); (2) Violation of the California Information Privacy Act ("CIPA"), Cal. Pen. Code §§ 631, *et seq*.; (3) Intrusion Upon Seclusion; (4) Breach of Confidence; and (5) Negligence.

## PARTIES

9. Plaintiff Ramadan Rouby is a natural person and citizen of the State of California. He resides in Contra Costa County.

10. Defendant The J.G. Wentworth Company is organized and existing under the laws of the State of Delaware with its principal place of business located at 1200 Morris Drive, Chesterbrook, PA 19087. Defendant conducts business throughout this District including soliciting business in this District and operating offices throughout the State of California.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because (i) at least one member of the Class is a citizen of a different state than any Defendant, (ii) the amount

3

in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that subsection apply to this action.

12. This Court has personal jurisdiction over Defendant because Defendant conducts business in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

13. Venue is proper pursuant to 28 U.S.C. § 1391(b) because Plaintiff resides in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred, in a substantial part, in this District.

## DIVISIONAL ASSIGNMENT

14. Pursuant to Civil Local Rule 3-2(d), this case should be assigned to San Francisco or Oakland Division because Plaintiff resides in this District and a substantial part of the events or omissions giving rise to the claim occurred within the County of Contra Costa.

## COMMON FACTUAL ALLEGATIONS

**A. Consumer Financial Information Is Sensitive and Confidential**

15. As a financial institution primarily engaged in lending, J.G. Wentworth is subject to federal obligations including the Gramm-Leach-Bliley Act ("GLBA") and parallel state laws such as the California Financial Information Privacy Act ("CFIPA").

*i. Defendant Failed to Comply with GLBA*

16. Defendant is a financial institution, as that term is defined by Section 509(3)(A) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A), and thus is subject to the GLBA.

17. The GLBA defines a financial institution, as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A). Under 12 U.S.C. § 1843(k)(4)(A), Defendant engages in financial activities because its business is "[l]ending, exchanging, transferring, investing for others, or safeguarding money or securities."

18. Pursuant to the GLBA, "each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

4

19. These obligations apply to any information a consumer furnishes to a financial institution when applying for a loan or obtaining any other financial product or service. The GLBA defines "nonpublic personal information" as "personally identifiable financial information." 16 C.F.R. § 313.3(n)(1). The GLBA further defines personally identifiable financial information as any information:

> (i) A consumer ***provides to you to obtain a financial product or service*** from you;
>
> (ii) About a consumer resulting ***from any transaction involving a financial product or service*** between you and a consumer; or
>
> (iii) You otherwise obtain about a consumer in connection with providing a financial product or service to that consumer.

16 C.F.R. § 313.3(o)(1) (emphasis added).

20. The GLBA provides specific examples of what information constitutes "personally identifiable financial information" including

> Information a ***consumer provides to you on an application to obtain a loan***, credit card, or other financial product or service;
>
> The fact that an ***individual is or has been one of your customers*** or has obtained a financial product or service from you;
>
> Any information about your consumer if it is disclosed in a manner that ***indicates that the individual is or has been your consumer***; [and]
>
> Any information ***you collect through an Internet "cookie"*** (an information collecting device from a web server).

16 C.F.R. 313.3(o)(2)(i)(A)-(F) (emphasis added).

21. Indeed, the GLBA prohibits financial institutions like J.G. Wentworth from disclosing nonpublic personal information to a nonaffiliated third party unless—

> (A) such financial institution ***clearly and conspicuously*** discloses to the consumer …that such information may be disclosed to such third party;
>
> (B) the consumer is given the opportunity**, *before the time that such information is initially disclosed,*** to direct that such information not be disclosed to such third party; and
>
> (C) the consumer is given an explanation of how the consumer can exercise that nondisclosure option.

15 U.S.C. § 6802(b) (emphasis added).

AMENDED CLASS ACTION COMPLAINT                                    CASE NO. 4:26-cv-3082-HSG

### ii.  Defendant Failed to Comply with CalFIPA

22.  States also regulate the disclosure of consumer financial information.  The California Legislature enacted the California Financial Information Privacy Act ("CalFIPA") because it found the "policies intended to protect financial privacy imposed by the Gramm-Leach-Bliley Act [to be] inadequate to meet the privacy concerns of California residents."  Cal. Fin. Code § 4051.5(a)(3).  CalFIPA intended to give Californians the ability to control the disclosure of their nonpublic personal information by "requiring that financial institutions that want to share information with third parties and unrelated companies seek and acquire the affirmative consent of California consumers prior to sharing the information."  *Id.* at § 4051.5 (b)(2).

23.  CalFIPA's author commented:

> [This law] will give consumers the final say in what happens to their personal financial information.  The bill has been meticulously crafted and would be the strongest financial privacy bill in the nation, and will likely serve as a national model.  ***It would generally require financial institutions such as banks, insurance companies and securities firms to get their customer's permission before they share a consumer's financial DNA with outside companies*** (opt-in)….Simply put, consumers should be the final arbiters of what happens to their personal financial information.  And [this bill] will give them that right.

California Bill Analysis, S.B. 1 Assem., Aug. 18, 2003 (emphasis added).

24.  The obligations under CalFIPA are simple: "a financial institution shall not sell, share, transfer, or otherwise disclose nonpublic personal information to or with any nonaffiliated third parties without the explicit prior consent of the consumer to whom the nonpublic personal information relates."  Cal. Fin. Code § 4052.5.

25.  CalFIPA has a strict opt-in requirement allowing financial institutions to share consumer financial information at the direction of the consumer and upon obtaining a "consent acknowledgment" from the consumer that meets specific statutory requirements.  Cal. Fin. Code § 4053(a)(1).  "A financial institution shall utilize a form, statement, or writing to obtain consent to disclose nonpublic personal information to nonaffiliated third parties . . . .  The form, statement, or writing shall meet all of the following criteria:

> (A) The form, statement, or writing is a separate document, not attached to any other document.

> (B) The form, statement, or writing is dated and signed by the consumer.

6

(C) The form, statement, or writing clearly and conspicuously discloses that by signing, the consumer is consenting to the disclosure to nonaffiliated third parties of nonpublic personal information pertaining to the consumer.

(D) The form, statement, or writing clearly and conspicuously discloses (i) that the consent will remain in effect until revoked or modified by the consumer; (ii) that the consumer may revoke the consent at any time; and (iii) the procedure for the consumer to revoke consent.

(E) The form, statement, or writing clearly and conspicuously informs the consumer that (i) the financial institution will maintain the document or a true and correct copy; (ii) the consumer is entitled to a copy of the document upon request; and (iii) the consumer may want to make a copy of the document for the consumer's records."

Cal. Fin. Code § 4053(a)(2).

**B.      J.G. Wentworth Installed Invasive Tracking Technologies on Its Website**

26.      Defendant J.G. Wentworth owns and operates a website where consumers can obtain various financial services, including debt consolidation loans and debt settlement, selling the proceeds of their structured settlement and annuity for immediate cash, personal loans, and home equity lines of credit, among other financial services.  *See* Figure 1.  Because it allows consumers to take out loans, sell or transfer money and securities, J.G. Wentworth is a financial institution.



(**Figure 1**)

27.      To obtain a financial product from J.G. Wentworth, consumers first fill out an application form and provide sensitive information about their finances and contact information.  The information consumers provide, as discussed in more depth below, is incredibly sensitive.  Therefore,

7

AMENDED CLASS ACTION COMPLAINT                    CASE NO. 4:26-cv-3082-HSG

consumers expect that their financial information be kept private and secure, especially given that they are interacting with a financial institution.

28. Defendant installed third-party trackers on its website (collectively referred to as "Tracking Technologies" herein) that gather a vast assortment of sensitive financial data from consumers. The installation of these trackers and their ability to facilitate the real-time interception of private consumer data is within Defendant's exclusive control.

29. When an individual accesses J.G. Wentworth's website, the Tracking Technologies instantaneously and surreptitiously duplicate communications with that webpage and send them to the third party. The information travels directly from both the user's browser and J.G. Wentworth's server to the third party's server. J.G. Wentworth's own actions enable the third parties' interception of this information.

30. Online Tracking Technologies may not be deleted from the consumers' device. They are built into J.G. Wentworth's website, and the consumer has no control or warning over their presence or data collection. The Tracking Technologies cause information to flow directly from the consumers' browser and J.G. Wentworth's server to the third-party itself. The consumer cannot prevent or even detect the transmission of data.

31. Here, J.G. Wentworth employed an array of Tracking Technologies to intercept, duplicate, and redirect Plaintiff's and the Class Members' sensitive financial information to a third party, contemporaneously, invisibly, and without their knowledge or consent.

32. When Plaintiff and the Class Members visited the J.G. Wentworth website and communicated their loan application information to Defendant, that information was simultaneously intercepted and transmitted to third parties.

33. One of the Tracking Technologies on J.G. Wentworth's website is operated by a data broker called "Segment." Segment purports to be "[t]he leading customer data platform, powered by AI." J.G. Wentworth intentionally embedded computer code on its website to disclose its consumers' sensitive financial information with Segment (the "Segment Tracker"). The Segment Tracker duplicates Plaintiff's and Class Members' communications intended for Defendant J.G. Wentworth,

including their loan application information, and transmits the content of those communications to Segment in real-time.

34.   Segment states that it is a "first-party data collection platform" and explains that it "is a tool that allows you to collect data from people who visit your website, use your products, or visit your physical locations."

35.   Once Segment collects data from consumers, it can process it in many ways, including further redisclosing it to advertisers and creating comprehensive consumer profiles.

36.   Segment offers various integrations with companies like Meta, Snap, and Google, thus allowing the exchange of consumer data between the platforms, including detailed information used for advertising and targeting consumers.  For example, the "Snapchat Audiences Actions destination enables the sync of Engage audiences into Snapchat," therefore allowing Segment and Snap to exchange data on consumers for advertising purposes.  Similarly, the Facebook (now Meta) integrations exchange data between the platforms to create audiences for advertising purposes: "Uses Facebook's Lookalike feature to target prospects who are similar to current audiences."

37.   Segment's Unify product creates consumer profiles from the customer data it collects. Segment promises to "[s]ave time and compute costs *by letting Segment build the complete history of each customer* across all online and offline touchpoints into real-time, identity-resolved profiles." Indeed, Segment profiles promise to create a digital dossier of the consumers' activity across various devices.

38.   Further:

> Segment Unify **collects data from all your sources**—including your data warehouse—and automatically **matches and merges** it to create unified, always up-to-date customer profiles.
>
> With warehouse interoperability, Unify **lets you both enrich profiles with data from your warehouse and send unified profiles back for advanced analysis**. Instantly activate these Segment profiles across your favorite marketing, analytics, and customer engagement tools to deliver personalized experiences and power smarter business decisions at every touchpoint. (emphasis added)

39.   The key feature of Segment's profiling product is identity resolution, which allows Segment to deanonymize consumers and to create a single profile of their activities and interests:

9

"Identity resolution allows you to stitch together user behavior across platforms, anonymous or known state and devices, which allows you to see the entirety of a user's journey and combine their customer data into a single golden profile. It is essential for understanding customer needs and preferences, as well as creating personalized customer journeys . . . ."

40.    Segment explains how its identity resolution feature analyzes and uses customer data:

> Unify resolves user identities in a deterministic manner. The Identity Graph supports multiple external IDs without any additional code. Each incoming event is analyzed, the external IDs are extracted, and then the Unify identity resolution tool algorithm matches events with profiles. A simplified version of the algorithm is as follows: Segment first searches the Identity Graph for incoming external IDs. If Segment doesn't find a matching profile, a Profile is created for that user. If Segment finds one Profile, the event is logged onto that profile. If Segment finds multiple matching profiles, Segment applies the identity resolution settings to add the event to the appropriate profile.

41.    As a consumer visits and interacts with the J.G. Wentworth Website, Segment collects the consumer's sensitive financial information and creates a profile on them.  When the consumer provides his or her name (and other contact information such as their email and phone number) as part of the loan application, Segment intercepts the submission and creates a comprehensive profile on the consumer and specifically identifies them.  If the consumer visits J.G. Wentworth's website again, or has an email exchange with a sales representative (perhaps at a later time or with a different device), Segment can instantaneously identify the consumer by matching their activity with a pre-existing profile.

42.    Armed with this single "golden profile," Segment can integrate with advertisers to use their data to further enrich its customer profiles and, in return, aid the advertiser in creating more detailed targeting profiles.

43.    The Segment Tracker has the capability to analyze the collected sensitive financial data by using artificial intelligence products, thus "[a]utomatically augment[ing] unified customer profiles with real-time, AI-generated traits—like likelihood to convert or churn—for downstream use in personalization and automation."  Segment's AI software can predict the likelihood that a consumer will perform any action, for example, his or her propensity to purchase, or predict their lifetime value ("LTV").

AMENDED CLASS ACTION COMPLAINT                                   CASE NO. 4:26-cv-3082-HSG

44. These consumer profiles are valuable to businesses, and Segment charges extra for access to its Unify product. Segment monetizes the data collected from Plaintiff and the Class to develop new products and services from the communications intercepted between Plaintiff and the Class and the J.G. Wentworth website. Upon information and belief, J.G. Wentworth both discloses consumer data to create these profiles, and then uses the unified profiles for its own sales purposes, leveraging data on consumer interactions with its Website to close sales with skeptical or weary customers.

45. J.G. Wentworth is not the only beneficiary of Segment's data collection and analysis. Segment's parent company, Twilio, reserves the right to use Plaintiff's and the Class Members' sensitive financial information—and any first party data it obtains from any consumer—for its own purposes: to develop new Twilio products and services as well as to improve its existing products and services.

46. The Twilio Privacy Notice explicitly states that it uses collected data (exactly like the financial information collected from J.G. Wentworth consumers and applicants) for "[d]eveloping new features or products . . . ." The Twilio Data Protection Addendum further states that Twilio uses customer collected data "to develop and improve new products and services and improve the performance, functionality, safety, and security of the Services."

47. Defendant J.G. Wentworth also installed the Meta Pixel (the "Meta Pixel"), allowing it to intercept communications between consumers and J.G. Wentworth's website as consumers engage and interact with the website.

48. The Meta tracker tracks consumers and actions they take on a website, in real-time, as they are navigating the website. This technology first gathers the real-time customer data, identifies customers and potential customers, targets advertisements to those individuals, and markets additional products and services to those individuals. The information collected and analyzed includes actions like when a consumer visits a particular website, clicks a button, fills out a form, web browser information, and an ID associated with the Facebook user called the "c_user" id.

49. The Meta tracker collects consumer interactions with the J.G. Wentworth website. Meta then aggregates that information to build its own massive, proprietary dataset, which Meta then uses to

11

find new customers for its advertising clients, drive sales, and understand ad impact. These actions benefit the website owner; J.G. Wentworth, as J.G. Wentworth both shares data with Meta and uses the Meta pixel for its own targeted advertising campaigns; Meta, as the third party data aggregator and broker; and other fourth parties, all of whom use the information for targeted marketing campaigns. Targeting works by allowing fourth parties to direct their ads at particular "Audiences," subsets of individuals who, according to Meta, are the "people most likely to respond to your ad."

**C.      J.G. Wentworth Discloses Consumers' Financial Data to the Tracking Technologies**

50.      Consumers can obtain financial services from J.G. Wentworth by first filling out an application. J.G. Wentworth designed its process to take place entirely online, and consumers apply for a consolidation loan or to obtain a structured settlement cashout by answering a series of questions.

51.      For example, to sell a structured settlement and receive cash, J.G. Wentworth requests the consumer to state the amount of cash they are requesting. *See* <u>Figure 2</u>. The consumer then provides his or her contact information including their name, email address, and phone number.



**(<u>Figure 2</u>)**

52.      Once the consumer submits the above information to J.G. Wentworth, the Segment Tracker surreptitiously and without the consumers' knowledge or consent collects the form entries. Segment collects, *in real time*, sensitive information from their application. Specifically, the Segment Tracker collects 1) the fact that the consumer is seeking a structured settlement cash advance, 2) the amount of money they are seeking, and 3) their contact information including a full name, email address, and phone number. *See* <u>Figures 3-4</u>.

AMENDED CLASS ACTION COMPLAINT                                    CASE NO. 4:26-cv-3082-HSG

```
"page":{
  "path":"/step2",
  "referrer":"https://www.jgwentworth.com/structured-settlements",
  "search":"?inquiry_product=1&amount=10000-25000",
  "title":"One more step! - JG Wentworth",
  "url":"https://www.jgwentworth.com/step2?inquiry_product=1&amount=10000-25000",
  "type":"organic",
  "landing":false,
  "landing_url":"https://www.jgwentworth.com/",
  "canonical":"https://www.jgwentworth.com/step2",
  "protocol":"https:",
  "hostname":"www.jgwentworth.com",
  "port":"",
  "hash":"",
  "initial_query":{
```

(**Figure 3,** showing that a consumer requested a cash out for a structured settlement and the amount.)

```
"data":{
  "amount":"",
  "first_name":"        ",
  "last_name":"        ",
  "email_address":"            @gmail.com",
  "phone_number":"(      -5013",
  "product_type_id":"1",
```

(**Figure 4,** showing the contact information collected by the Segment Tracker. Redacted for privacy.)

53.    The Meta Pixel also collects sensitive financial information regarding the consumer's requested structured settlement plan cash out.  Meta collects the button clicks on the J.G. Wentworth website, descriptive URLs revealing the name of the product requested, and the requested cash out amount.  Meta identifies the consumer by a unique "c_user" id which corresponds with the consumer's Facebook profile.

54.    A similar process takes place when consumers apply for debt consolidation loans. Consumers complete an application and provide J.G. Wentworth with sensitive financial and demographic information including: 1) loan amount, 2) income, 3) employment status, 4) whether the consumer rents or owns, 5) home address, 6) birthday, and 7) contact information including full name, email address, and phone number.

55.    The Segment Tracker, as shown in **Figure 5,** collects all form inputs in real time.

```
"data":{
  "loanAmount":5000,
  "employmentStatus":"self_employed",
  "annualIncome":60000,
  "propertyStatus":"rent",
  "first_name":"        ",
  "last_name":"        ",
  "email_address":"            @gmail.com",
  "phone_number":"            ",
  "address1":"            ",
  "address2":"",
  "city":"        ",
  "state":        ,
  "zip":"      ",
  "dateOfBirth":        ,
  "dr_response":"",
  "ssn":"",
  "educationLevel":"bachelors",
  "employmentPayFrequency":"biweekly",
  "purpose":"debt_consolidation",
  "jgw_product":"DS",
```

**(Figure 5)**

56.     The Meta Pixel, on the other hand, collects descriptive URLs revealing the product or service that the consumer is requesting (i.e. a debt consolidation or personal loan).  As such, J.G. Wentworth discloses a consumer's status as a customer of J.G. Wentworth and the product(s) they are requesting.  The Meta Pixel also collects a persistent identifier called the "c_user" ID which specifically identifies the consumer and allows Meta to serve relevant targeted advertisements to the consumer.

57.     Finally, consumers seeking a home equity line of credit—or "HELOC" loan—must submit an application on the J.G. Wentworth website.  Consumers provide J.G. Wentworth with information about their 1) home's value, 2) mortgage balance, 3) address, and 4) contact information.  As shown in **Figure 6**, the Segment Tracker collects all form entries revealing highly sensitive non-public financial information.  Furthermore, the Segment Tracker collects additional information that the consumer did not provide, but instead which J.G. Wentworth calculates, including the maximum and minimum home value, and the minimum and maximum loan amounts.

AMENDED CLASS ACTION COMPLAINT                                    CASE NO. 4:26-cv-3082-HSG

```
"data":{
  "address_full":"                                    ,
  "max_property_value":"200
  "min_property_value":"150
  "min_offer_value":"150
  "max_offer_value":"400
  "valid_property_usage":"",
  "max_avm_fsd_value":"0.15",
  "valid_property_type":"",
  "is_subpremise_missed":"true",
  "min_offer_knockout_value":"0",
  "home_value_update_threshold":"0.3",
  "address1":"
  "address2":"",
  "city":
  "state":
  "zip":"
  "self_reported_property value":
  "market_value":"
  "skip_value_to_check":"false",
  "self_reported_mortgage_balance":
  "first_name":"
  "last_name":"
  "email_address"
  "phone_number":"
  "input_739":"",
```

(**Figure 6**)

58. The information provided by consumers to J.G. Wentworth is nonpublic, personal information. This information is sensitive and its disclosure is strictly regulated under both the GLBA and the CFIPA requiring consumer consent prior to the disclosure to nonaffiliated parties.

59. Defendant J.G. Wentworth never informed consumers like Plaintiff or the Class that it procured third parties like Segment and Meta to intercept and collect their sensitive financial information, and certainly never obtained consent of any kind from Plaintiff or the Class before this information was disclosed.

60. Segment and Meta are not an affiliate of Defendant J.G. Wentworth. They are neither a parent nor a subsidiary of Defendant, and are not controlled by nor control Defendant. They are entirely independent third-party entities. J.G. Wentworth failed to obtain any consent from Plaintiff and Class Members to allow these third parties to intercept and collect their sensitive financial information to nonaffiliated companies, let alone obtained sufficient consent as required under the Gramm-Leach-Bliley Act and the California Financial Information Privacy Act.

AMENDED CLASS ACTION COMPLAINT                                    CASE NO. 4:26-cv-3082-HSG

61. Defendant did not only collect consumers' sensitive financial information for its own use; J.G. Wentworth also shared, and continues to share, consumers' financial information with unauthorized third parties who then use it for their own benefit.

## PLAINTIFF'S EXPERIENCE

62. Plaintiff Ramadan Rouby visited the J.G. Wentworth website within the last year. Plaintiff browsed the various financial products offered by J.G. Wentworth, including its debt consolidation loans and debt settlement services, and submitted an application for a consolidation loan. Plaintiff provided sensitive financial information to J.G. Wentworth through its website, including but not limited to how much money he needed, his employment status, his income, whether he rents or owns his home, his name, his address, his date of birth, and his contact information.

63. Plaintiff never gave consent to J.G. Wentworth or any other party to collect or intercept any of his private financial information whatsoever.  In fact, he was informed that his application would not affect his credit score, and believed his sensitive financial information would remain private and confidential.  Plaintiff was not informed, and had no reason to believe, that unidentified third parties would intercept his communications with J.G. Wentworth, including sensitive financial information, as part of his application for a debt consolidation loan.

64. After submitting his consolidation loan application with J.G. Wentworth, Plaintiff began receiving targeted advertisements related to debt resolution and settlement programs, leading him to believe that J.G. Wentworth would allow third parties to intercept and collect the content of his application without authorization.

## CLASS ACTION ALLEGATIONS

65. Class Definition: Plaintiff Ramadan Rouby brings this proposed class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of himself and a Class of others similarly situated, defined as follows:

> **Nationwide Class:** All individuals residing in the United States who have submitted any contact information through Defendant's website in connection with an application for a financial product or service offered by Defendant within the past two years.

> **California Class:** All individuals residing in the State of California who have submitted any contact information through Defendant's website in connection with an application for a financial product or service offered by Defendant within the past year.

16

AMENDED CLASS ACTION COMPLAINT                                    CASE NO. 4:26-cv-3082-HSG

66. Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and its officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

67. Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

68. Numerosity: The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose private information may have been improperly disclosed to third parties, and the Class is identifiable within Defendant's records.

69. Commonality: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members.  These include:

    a) Whether the Tracking Technologies intentionally intercepted any of Plaintiff's and Class Members' communications with J.G. Wentworth;

    b) Whether the Tracking Technologies are devices used to intercept Plaintiff's and the Class Members' communications with J.G. Wentworth;

    c) Whether J.G. Wentworth procured the Tracking Technologies to intercept Plaintiff's and the Class Members' communications with J.G. Wentworth;

    d) Whether Plaintiff and the Class Members consented to the aforementioned interception of their communications with J.G. Wentworth;

    e) Whether Plaintiff and the Class were injured by J.G. Wentworth's conduct;

    f) Whether J.G. Wentworth unlawfully used the data obtained by the Tracking Technologies' interception;

    g) Whether the Tracking Technologies used, or had the ability to use the data obtained from this interception for their own benefit; and,

17

AMENDED CLASS ACTION COMPLAINT

CASE NO. 4:26-cv-3082-HSG

h) Whether Plaintiff and the Classes are entitled to damages as a result of Defendant's conduct and if so in what amount.

70. Typicality: Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's incorporation of the Tracking Technologies.

71. Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

72. Superiority and Manageability: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

73. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

AMENDED CLASS ACTION COMPLAINT                                                      CASE NO. 4:26-cv-3082-HSG

74. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

75. The litigation of the claims is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

76. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

77. Unless a class-wide injunction is issued, Defendant may continue disclosing the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

78. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

**CAUSES OF ACTION**

**COUNT I**
**Violation of the Electronic Communications Privacy Act ("ECPA")**
**18 U.S.C. § 2511 *et seq*.**
**(On behalf of Plaintiff and the Nationwide Class)**

79. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

80.    The Electronic Communications Privacy Act ("ECPA") prohibits any person from intercepting or procuring any other person to intercept an electronic communication.  18 U.S.C. § 2511(1)(a).  Furthermore, the ECPA prohibits any person disclosing to any other person the content of an electronic communication, 18 U.S.C. § 2511(1)(c), and intentionally using the contents of any electronic communication, knowing or having reason to know that the information was obtained through unlawful interception.  18 U.S.C. §2511(d).

81.    Communications between Plaintiff and the Class and Defendant's financial services platform are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

82.    The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

83.    The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

84.    The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]"  18 U.S.C. § 2510(5). The following instruments constitute "devices" within the meaning of the ECPA:

a)  The Segment Tracker and the Meta Pixel;

b)  The web servers owned and operated by the Segment Tracker and the Meta Pixel;

c)  Plaintiff's and Class Members' mobile devices and/or computers; and,

d)  Defendant's web servers.

85.    The Plaintiff and the Class's interactions with the Defendant's website are electronic communications within the meaning of the ECPA.  The transmission of their sensitive financial information, including descriptive URLs, button clicks, and form inputs is "content" of the electronic communication.

20

AMENDED CLASS ACTION COMPLAINT                                    CASE NO. 4:26-cv-3082-HSG

86.     By enabling third parties to collect sensitive financial information including descriptive URLs, button clicks, and form inputs, Defendant procured another person to intercept the electronic communications of Plaintiff and Class members in violation of 18 U.S.C. § 2511(1)(a).

87.     In enlisting the Tracking Technologies to intercept and analyze Plaintiff and the Class Members' interactions with its Website, and using the outputs of those analyses for its own sales and marketing purposes, J.G. Wentworth intentionally used the contents of communications while it had reason to know that such information obtained by interception, in violation of 18 U.S.C. § 2511(1)(d).

88.     Defendant's acts of sharing Plaintiff and the Class's confidential financial information for unauthorized use by third parties were criminal and/or tortious acts.  Further, Defendant tortiously failed to disclose a material fact from these consumers, namely that it would be sharing their sensitive financial data with third parties without their consent.

89.     Plaintiff and the Class did not authorize third parties like Segment or Meta to acquire the content of their communications with Defendant for any purpose whatsoever, much less to disclose that information to additional fourth party advertisers.  Plaintiff and the Class had an expectation of privacy that their financial information would not be disclosed with others without their knowledge or consent.

90.     As such, Plaintiff seeks statutory damages in the amount of $10,000 per violation pursuant to 18 U.S.C. § 2520 including costs and attorneys' fees.

**COUNT II**
**Violation of the California Information Privacy Act ("CIPA")**
**Cal. Pen. Code §§ 631 and 632**
**(On behalf of Plaintiff and the California Class)**

91.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

92.     The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.  The Act begins with its statement of purpose.

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

21

93.     California Penal Code § 631(a) provides, in pertinent part (emphasis added):

Any person who, by means of any machine, instrument, or contrivance, or in any other manner … willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or **who aids, agrees with, employs, or conspires** with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

94.     Under CIPA, Defendant must show it had the consent of all parties to a communication before allowing or instructing a third-party to intercept those communications.

95.     At all relevant times, Defendant aided, employed, agreed with, and conspired with third parties, including Meta and Segment, to track and intercept Plaintiffs' and Class Members' internet communications with Defendant.  The contents of these communications were transmitted to and intercepted by a third party during the communication, in real-time, without the knowledge, authorization, or consent of Plaintiffs and Class Members.

96.     Defendant intentionally inserted an electronic listening device, the Meta and Segment trackers, onto Plaintiff's and Class Members' web browsers and devices that, without their knowledge and consent, tracked and transmitted the substance of their confidential communications with Defendant to Segment and Meta—each of whom constitute a "person" within the meaning of the statute.

97.     Defendant willingly facilitated the interception and collection of Plaintiff's and Class Members' sensitive financial information by embedding Tracking Technologies on its website.

98.     The Tracking Technologies constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, they fall under the broad catch-all category of "any other manner."

99.     Defendant failed to obtain consent from Plaintiff and the Class Members to use the Tracking Technologies to track and automatically and simultaneously transmit their communications containing sensitive financial data with Defendant to Segment and Meta.

22

AMENDED CLASS ACTION COMPLAINT                                    CASE NO. 4:26-cv-3082-HSG

100. Defendant violated CIPA by aiding and permitting third parties to intercept and receive its consumers' online communications in real time as they were made. Importantly, the Tracking Technologies would not have intercepted or received the contents of these communications but for Defendant's actions, including its decision to install the Tracking Technologies on its website.

101. By allowing third parties to intercept Plaintiff's and Class Members' sensitive financial information, Defendant violated Plaintiff's and Class Members' statutorily protected right to privacy.

102. Plaintiff's and the Class Members' sensitive financial information is considered a "confidential communication" under Cal. Pen. Code § 632(c) because it arose in circumstances "as may reasonably indicate that any party to the communication desires it to be confined to the parties . . . ."

103. As a result of the above violations, and pursuant to § 637.2, Defendant is liable to Plaintiff and Class Members for treble actual damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

104. Under the statute, Defendant is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

### COUNT III
### Intrusion Upon Seclusion
### (On behalf of Plaintiff and the Nationwide Class)

105. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

106. Defendant intentionally and without the Plaintiff's and the Class Members' authorization intruded into their seclusion. Specifically, Defendant intentionally embedded trackers on its website that collected sensitive financial information from the Plaintiff's and the Class Members' loan applications and applications for other financial services.

107. Defendant knew that by installing the Tracking Technologies on its website, it would allow an unaffiliated third party to intrude or pry into Plaintiff's and Class Members' sensitive financial information.

108. Plaintiff and the Class expect their financial information and their loan applications to remain private and not be disseminated to unknown third parties.

109. Indeed, a reasonable person would find the disclosure of their sensitive financial information and the content of their loan applications without their knowledge or consent highly offensive and objectionable, especially when the applications and nature of the financial products reveal their household's overall debt burden, and that they are struggling to pay off their debts.

110. Plaintiff and the Class Members suffered harm in the form of mental pain and anguish stemming from inappropriate and intrusive advertisements for predatory financial products and services, and worrying how an unauthorized disclosure of their financial information to unknown third parties may affect their life. Plaintiff and the Class worry how this disclosure (1) may affect their ability to get a loan in the future, (2) whether nefarious actors may use their information to perpetuate identity theft and fraud, (3) who and for what purpose third parties may have obtained their personal financial information, and (4) how Plaintiff and the Class may secure their sensitive financial information in the future.

**COUNT IV**
**Breach of Confidence**
**(On behalf of Plaintiff and the Nationwide Class)**

111. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

112. Plaintiff and the Class conveyed confidential information to Defendant when filling out a loan application and seeking other financial services. The information provided contained sensitive demographic and financial information that Defendant used or intended to use to determine loan eligibility and eligibility for any other financial product.

113. Defendant, being a financial institution, knew that the information it solicited from Plaintiff and the Class was being conveyed in confidence. Not only is there an expectation that financial information is confidential; both Federal and state law require financial institutions to keep information furnished to a financial institution to be confidential. *See, e.g,* 18 U.S.C.§ 6801(a).

114. As explained above, Defendant allowed trackers to obtain sensitive financial information from Plaintiff's and the Class's loan application in breach of confidence.

24

AMENDED CLASS ACTION COMPLAINT                                    CASE NO. 4:26-cv-3082-HSG

## COUNT V
### Negligence
### (On behalf of Plaintiff and the Nationwide Class)

115.   Plaintiff incorporates the foregoing allegations as if fully set forth herein.

116.   Plaintiff and the Class Members submitted sensitive nonpublic personal information, including personal and financial information, when accessing J.G. Wentworth's website and its online applications for financial products and services.

117.   Defendant owed to Plaintiff and Class Members a duty to exercise reasonable care in handling and using Plaintiff's and the Class Members' personal financial information in its care and custody, including implementing procedures sufficient to reasonably protect the information from the disclosure.  These duties to safeguard Plaintiff and the Class Members' nonpublic personal information arise from under the GLBA, which establishes "an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information."  15 U.S.C. § 6801(a).

118.   Defendant's duties to Plaintiff and the members of the California Subclass also arise under CalFIPA, which requires financial institutions to obtain a consumer's affirmative consent before disclosing protected information to third parties, including advertisers.  Cal. Fin. Code § 4052.5.

119.   In installing the Tracking Technologies on its website for ultimate use in targeted advertising, Defendant knew or should have known that Plaintiff and the Class Members' protected financial data would be disclosed to those third-party tracking technologies, and re-disclosed to fourth-party advertisers.  In doing so, Defendant breached the duty of care it owed to Plaintiff and the Class.

120.   As a direct, proximate, and traceable result of Defendant's installation of these technologies, Plaintiff and the Class Members have suffered or imminently will suffer injury and damages.  Namely, Plaintiffs suffer monetary damages in the form of lost value of their personal financial information and diminution in value, as well as emotional damages and distress through the inappropriate and intrusive targeted advertisements they receive.  Plaintiffs also face increased risk of future harm, embarrassment, humiliation, frustration, and stigma stemming from the disclosure of the fact that they were a J.G. Wentworth customer to fourth party advertisers, and others.

AMENDED CLASS ACTION COMPLAINT                                    CASE NO. 4:26-cv-3082-HSG

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Ramadan Rouby individually and on behalf of the Class, prays for the following relief:

       a)  An order certifying the Class as defined above, appointing Ramadan Rouby as the representative of the Class, and appointing his counsel as Class Counsel;

       b)  An order declaring that Defendant's actions, as set out above, violate the ECPA, CIPA, and constitute an intrusion upon seclusion, breach of confidence, and negligence;

       c)  An injunction requiring Defendant to cease all unlawful activities;

       d)  An award of statutory damages, disgorgement of profits, costs, and attorneys' fees; and,

       e)  Such other and further relief that the Court deems reasonable and just.

**JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully Submitted,

Dated: May 18, 2026

By: */s/ Yaman Salahi*

Yaman Salahi (SBN 288752)
yaman@salahilaw.com
Nicole Cabañez (SBN 365099)
nicolec@salahilaw.com
Taylor Applegate (SBN 357742)
taylora@salahilaw.com
**SALAHI PC**
505 Montgomery Street, 11th Floor
San Francisco, CA 94111
Tel: (415) 236-2305

Albert Plawinski*
**PLAWINSKI, PLLC**
2101 Pearl St.
Boulder, Colorado 80302
Tel: (303) 720-7095
Email: albert@plawinski.law

*Pro Hac Vice Admission to be sought*

*Counsel for Plaintiff and the proposed Class*

AMENDED CLASS ACTION COMPLAINT

CASE NO. 4:26-cv-3082-HSG